**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EMILIO CHAVEZ, | |
| **Plaintiff,** | |
| v. | Case No. 25-cv-1616-NJR |
| WEXFORD HEALTH SOURCES, INC., WARDEN WILLS, DIRECTOR HUGHES, ADA COORDINATOR LAWRENCE, ASSISTANT ADA COORDINATOR KUHNERT, NURSE PRACTITIONER MOLDENHAUER, NURSE PRACTITIONER DEARMOND, NURSE PRACTITIONER CRANE, JANE DOE #'s 1-5, DR. BROPHY, and JOHN DOE #1 MAJOR, | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Emilio Chavez, an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Chavez's Complaint (Doc. 1) was dismissed without prejudice for violating both Rule 8 and the rules of joinder (Doc. 16, pp. 3-7), but he was granted leave to file an amended pleading. In his First Amended Complaint, Chavez alleges that defendants were deliberately indifferent to his knee injury.

The case is now before the Court for preliminary review of the First Amended Complaint pursuant to 28 U.S.C. § 1915A. Under Section 1915A, the Court is required to

1

screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b).

## The First Amended Complaint

Prior to his incarceration, Chavez suffered an injury to his left knee that required the reconstruction of his ACL and a partial meniscectomy (Doc. 20, p. 5). He had surgery on August 29, 2022. After the surgery, he was prescribed physical therapy, and follow-up appointments for future surgeries to repair his injury were recommended (*Id.*). On October 20, 2022, he transferred into the custody of IDOC; he arrived at Menard on December 1, 2022 (*Id.* at pp. 5-6).

Upon arriving at Menard, Chavez immediately began submitting sick call requests indicating his pain levels, need for physical therapy, and difficulty walking due to his injury (Doc. 20, p. 6). On January 26, 2023, he informed Jane Doe #1 nurse during the med-line that he was in extreme pain (*Id.*). She directed him to file a sick call request, but he had already filed three requests by that time (*Id.*). She merely stated "whatever" and walked away. The next day, Jane Doe #1 called him to the sick call line (*Id.* at p. 7). He explained his surgery and his need for follow-up care (*Id.*). She noted that because there was a lack of adequate medical staff, it would be hard to help him (*Id.*). Chavez was sent back to his cell without care (*Id.*).

Chavez continued to submit nurse sick call requests throughout February 2023 (Doc. 20, p. 7). Chavez grew frustrated with the lack of response, and on February 15,

2

2023, he told an officer that he was declaring a hunger strike because of his extreme knee pain (*Id.*).[1] Chavez spoke to John Doe #1 major who informed Chavez that he would meet with medical staff on either February 16 or 17 (*Id.* at p. 8). The major explained that delays in his care were due to Wexford not having enough physicians at the prison (*Id.*). But Chavez was not called to the nurse sick call line as the major promised. Chavez alleges that delays in his care were caused by understaffing of the healthcare unit (*Id.*). He noted that Wexford only had three nurse practitioners and one or two medical doctors to treat all of the inmates at Menard (*Id.*).

On February 27, 2023, Chavez finally saw Nurse Practitioner Moldenhauer (Doc. 20, p. 8). Chavez stated that he had severe pain while walking and his knee would give out (*Id.*). He requested additional care for his knee due to its instability. Moldenhauer informed Chavez that he was unsure as to when Chavez would be sent out for care because there was not enough staff at the prison (*Id.*). Despite being in significant pain, Moldenhauer failed to prescribe any pain medication, nor did he seek to expedite a referral for a follow-up appointment outside of the prison (*Id.* at p. 9).

On April 4, 2023, Chavez spoke with Jane Doe #2 nurse during the sick call line (Doc. 20, p. 9). He explained that he could not walk without severe pain and needed follow-up care (*Id.*). Jane Doe #2 noted that the prison did not have access to Chavez's

---

[1] Chavez at first indicates that he declared a hunger strike on February 5, 2023, but he notes in the next paragraph that "[a] few minutes later on 2/15/23" he spoke to the major about his concerns (Doc. 20, p. 7). His subsequent allegations suggest that he declared his hunger strike on February 15 rather than February 5.

pre-incarceration medical files and she did not know of his condition. She also informed Chavez that inmates were required to submit at least three requests for the sick call line before being seen in the healthcare unit (*Id.*). She reiterated that Wexford did not have enough qualified medical professionals and sent him back to his cell (*Id.*).

On April 27, 2023, Chavez saw Dr. Beyer at Heartland Regional Medical Center regarding his knee (Doc. 20, p. 10). Dr. Beyer noted that Wexford did not have his previous medical records, but he ordered physical therapy (*Id.*). Afterwards, Chavez was scheduled for physical therapy, but the therapy was often canceled due to lack of staffing or lockdowns at the prison (*Id.*). On June 5, 2023, Chavez spoke to Jane Doe #3 nurse about his inability to obtain physical therapy despite Dr. Beyer's orders (*Id.*). She merely told him that he should not have come to jail and his pain was not her problem (*Id.*). Similarly, on June 13, he spoke to Jane Doe #4 about his pain and she merely responded "so what" and walked away (*Id.* at p. 11).

On July 5, 2023, Chavez met with either Nurse Practitioner Dearmond or Nurse Practitioner Crane (Doc. 20, p. 11). He asked about delays in accessing the healthcare unit and physical therapy appointments and she told him that there are no appointments during lockdowns (*Id.*). Chavez alleges that he should have been moved to a prison that did not cancel appointments during lockdowns (*Id.*).

On July 14, 2023, Chavez had another surgery, this time for a meniscus repair on the same knee (Doc. 20, p. 11). After the surgery, Dr. Beyer informed Chavez that he would still suffer from MCL insufficiency and he would need another surgery to fully

repair his knee (*Id.* at pp. 11-12). Dr. Beyer prescribed crutches and a brace and recommended Chavez for additional surgery (*Id.*).

In September 2023, Chavez was referred to Dr. Brophy (Doc. 20, pp. 12-13). Dr. Brophy drained fluid from his knee but did not conduct an instability test (*Id.* at p. 13). Chavez explained his injury and two previous surgeries. He informed Dr. Brophy of Dr. Beyer's diagnosis of MCL insufficiency and his need for an additional surgery (*Id.*). He also informed Dr. Brophy that he was in significant pain and suffered from instability when trying to walk (*Id.*). Dr. Brophy noted that Chavez would be fine.

On October 17, 2023, Chavez had a follow-up appointment with Dr. Beyer who inquired about the referral for additional surgery (Doc. 20, p. 13). Chavez told him that Dr. Brophy only drained fluid from his knee. Dr. Beyer noted that he needed surgery or his knee would not properly heal. He prescribed a different brace to provide more stability and again recommended the additional surgery to repair Chavez's knee (*Id.*).

On November 14, 2023, Chavez saw Nurse Practitioner Crane. She told him to submit a request for an extension of the knee brace. He showed Crane how unstable his knee was without the brace (Doc. 20, p. 13). He was again referred to Dr. Brophy based on Dr. Beyer's recommendation and again informed Dr. Brophy of his severe pain and instability (*Id.* at pp. 13-14). Dr. Brophy refused to remove the brace to conduct an instability test (*Id.*). Chavez alleges that the proper standard of care required that Dr. Brophy conduct the instability test without the brace in order to clearly test the stability of his knee (*Id.* at p. 14).

5

On December 20, 2023, Chavez requested the cancellation of his bottom bunk permit because of his placement on a bottom gallery and use of his prescribed brace (Doc. 20, p. 14). He felt that with the brace and being housed in the ADA unit, he no longer needed a bottom bunk (*Id.*). But he did submit additional requests to Nurse Practitioner Crane requesting an extension of his knee brace prescription (*Id.*). Chavez attended physical therapy at the prison. During one appointment, the physical therapist noted that the instability in his knee was severe, and she placed him on an urgent list to see the doctor (*Id.*). Although still housed in the ADA unit, he was eventually forced to give up his knee brace in March 2024 (*Id.* at p. 16).

On March 28, 2024, Chavez was approached by Sergeant Davis and told that he "messed up" by writing a grievance in February (Doc. 20, p. 16). On April 6, 2024, Davis and Officer Cross wrote disciplinary tickets that Chavez alleged were falsified in retaliation for filing grievances. He was subsequently placed on a floor away from the showers, requiring him to traverse several flights of stairs to attend the showers (*Id.*). At that point, Chavez lacked a bottom gallery and a brace permit, and walking to the showers caused him severe pain (*Id.*). Chavez alleges that he was unable to access the showers from April through September 2024 due to the significant pain he experienced walking to the showers (*Id.* at p. 18).

A scheduled August 2024 appointment with the nurse practitioner was canceled due to inadequate staffing (Doc. 20, p. 17). His appointment with the nurse practitioner was allegedly delayed due to the lack of proper staffing by Wexford. On July 24, 2024, he met with Jane Doe #5 nurse about the instability in his knee (*Id.*). She told him that she

6

did not know when he would be seen due to understaffing and sent him back to his cell (*Id*.). On September 11, 2024, Chavez saw Jane Doe #5. She informed him that the previous pass to see the doctor was canceled because there was only one doctor at the prison (*Id*. at pp. 17-18). On October 17, 2024, he finally met with Nurse Practitioner Dearmond about his continued pain and instability (*Id*. at p. 19). He noted that he was unable to access the shower and his medications were not enough to handle the pain (*Id*.). She contended that his gallery was considered a low gallery, despite the showers being on the bottom gallery (*Id*.). And, despite his request for a follow-up appointment with an outside specialist and complaints regarding his access to a brace, she merely sent him back to his cell (*Id*.). Chavez alleges that he remained on the gallery and was not moved back to the ADA unit until January 2025 (*Id*.). He had an MRI in May 2025 but still continues to suffer from instability in his knee, trouble walking, and significant pain (*Id*. at p. 21).

Chavez wrote numerous grievances about his condition and need for physical therapy and medical care. Warden Anthony Wills deemed some of those grievances an emergency (Doc. 20, pp. 7, 8, 9, 10, 12, 15, 16, 18, 20). Several grievances were sent to ADA Coordinator Lawrence and/or ADA Assistant Coordinator Kuhnert but the grievances were denied either because the issues, such as Chavez's access to physical therapy, did not involve ADA requests or it was understood that he no longer needed the accomodation (*Id*. at pp. 8, 9, 15-17). For instance, in response to Chavez's grievance regarding his access to a knee brace, ADA Coordinator Kuhnert responded that she called the clinic and was informed that Chavez no longer needed the brace (*Id*. at p. 15). Latoya

7

Hughes denied his grievances (*Id.* at p. 12, 15-16, 19). Chavez further alleges that his September 2024 grievance was never returned after Wills denied the grievance as being an emergency (*Id.* at p. 18). Chavez alleges that Wills intentionally mishandled the grievance as an act of retaliation for naming Wills in the grievance (*Id.*). The grievance claimed that Wills failed to conduct investigations into prisoner complaints regarding healthcare (*Id.*). He alleges that Wills continued to retaliate against Chavez by deeming his grievances not an emergency (*Id.* at pp. 19-21).

### **Preliminary Dismissals**

Chavez refers to a Nurse Beth whom he saw on several occasions for medical care. He also alleges that Sergeant Davis and Officer Cross retaliated against him for filing grievances by issuing false disciplinary tickets. But none of these individuals are identified as defendants in the case caption. In order to be a party in the case, a plaintiff must identify them in the case caption. *See* FED. R. CIV. P. 10(a); *Myles v. United States*, 416 F.3d 551, 551–52 (7th Cir. 2005). Because Chavez failed to identify these individuals as defendants, any potential claim against them is **DISMISSED without prejudice**.

Chavez also alleges that Warden Wills, Director Hughes, and ADA Coordinators Lawrence and Kuhnert were deliberately indifferent to his serious medical needs when they denied his grievances or failed to properly investigate his grievances. But the simple denial or mishandling of a grievance fails to state a claim. *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (there is no "free-floating obligation to put things to rights"). Although he alleges that Lawrence and Kuhnert responded to his grievances regarding previous requests for a brace and low

gallery permit, there are no allegations to suggest that he actually made these requests for accommodations to the coordinators themselves. The allegations merely suggest that they responded to his grievances (Doc. 20-1, p. 3, 23, 27). Thus, he fails to state a claim against any of the grievance officials for their denial of his grievances.

Chavez also alleges that Warden Wills sought to retaliate against him by mishandling several of his grievances. He alleges Wills mishandled at least two grievances by labeling them not an emergency and failed to return them. In order to state a retaliation claim, a plaintiff must allege that he engaged in protected activity, "suffered a deprivation likely to deter such activity," and the "First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell,* 756 F.3d 983, 996 (7th Cir. 2014). "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). But Chavez merely alleges in conclusory fashion that Wills sought to retaliate against him by labeling his grievances not an emergency. Without more, he fails to state a viable retaliation claim.

Finally, Chavez alleges that John Doe #1 turned a blind eye to the delays in his care when he informed Chavez that he would be seen in the next few days. Chavez alleges that he was not seen by medical providers over those two days. But the allegations only suggest that he saw the unknown major on one occasion, when the major indicated he would be seen by medical staff. There are no allegations to suggest that he spoke to the major at any other time. Nothing in the pleading suggests that the major was aware that Chavez was not seen by medical staff in the relevant timeframe or that he acted with

9

deliberate indifference. Thus, any claim against John Doe #1 is **DISMISSED without prejudice**.

## Discussion

Based on the allegations in the First Amended Complaint, the Court designates the following counts:

**Count 1:** Eighth Amendment deliberate indifference claim against Nurse Practitioner Moldenhauer, Nurse Practitioner Crane, and Nurse Practitioner Dearmond for denying and delaying medical care for Chavez's injured knee.

**Count 2:** Eighth Amendment deliberate indifference claim against Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, and Jane Doe #5 for denying and delaying medical care for Chavez's injured knee.

**Count 3:** Eighth Amendment deliberate indifference claim against Dr. Brophy for providing inadequate medical care for Chavez's injured knee.

**Count 4:** ADA claim for denying Chavez an accessible shower and brace for his knee.

**Count 5:** *Monell* claim against Wexford Health Sources, Inc. for having a practice of understaffing the healthcare unit, causing delays in Chavez's medical treatment.

**Count 6:** Illinois state law claim for negligence against Nurse Practitioner Moldenhauer, Nurse Practitioner Crane, and Nurse Practitioner Dearmond for denying and delaying medical care for Chavez's injured knee.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the First Amended Complaint but not addressed in this Order should be**

**considered dismissed without prejudice as inadequately pled under the** *Twombly*

**pleading standard**.[2]

*Counts 1, 2, and 6*

At this stage, Chavez states viable claims for deliberate indifference against the

nurse practitioners and Jane Doe nurses. He alleges that he spoke with each one and they

denied him care and caused delays in his care. He alleges that he was denied pain

medication, a low gallery permit, and a brace for his knee. Thus, Count 1 shall proceed

against Nurse Practitioner Dearmond, Nurse Practitioner Moldenhauer, and Nurse

Practitioner Crane. Count 2 shall proceed against Jane Doe Nurses #'s 1-5. Warden

Matthew Plummer is **ADDED** to the case (in his official capacity only) to respond to

discovery aimed at identifying the unknown nurses.

Chavez also states a negligence claim against the nurse practitioners under Illinois

state law. Thus, the Court will exercise supplemental jurisdiction over the related state

law claim. 28 U.S.C. § 1367(a). Chavez has not provided the affidavit and medical report

required by 735 ILCS § 5/2-622, but the omission of these documents is not dispositive of

his claim at screening. Chavez must, however, submit the required documents in order

to survive summary judgment. *See Young v. United States*, 942 F.3d 349, 351-52 (7th Cir.

2019).

---

[2] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face").

*Count 3*

Chavez fails to state a claim against Dr. Brophy. In order to state a claim of deliberate indifference to medical needs, a plaintiff must plead that he suffered from "an objectively serious medical condition" and that a "state official was deliberately… indifferent" to that condition. *See Giles v. Godinez*, 914 F. 3d 1040, 1049 (7th Cir. 2019). A plaintiff must demonstrate that the defendants' actions were more than negligent, something approaching intentional wrongdoing or recklessness. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Chavez alleges that Dr. Brophy only removed fluid from his knee, and at the first appointment he failed to conduct a stability test. He alleges that at a follow-up appointment Dr. Brophy conducted a stability test but with a brace, which Chavez believes to be improper. But the allegations suggest that Dr. Brophy provided him with care. An attached grievance from the healthcare unit administrator notes that Dr. Brophy explained to Chavez that he recommended aspiration and cortisone injections, but was hesitant on surgery (Doc. 20-1, p. 30). He also directed Chavez to follow up as needed. The allegations do not suggest deliberate indifference. Although Chavez disagrees with the course of treatment provided by Dr. Brophy, his mere disagreement does not amount to deliberate indifference. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). And to the extent Chavez alleges that Dr. Beyer also disagreed with Dr. Brophy's course of treatment, the allegations, at most, amount to negligence—which does not equate to deliberate indifference. Dr. Brophy examined

12

Chavez and provided him with treatment. Nothing in his amended pleading rises to the level of deliberate indifference. Thus, Count 3 is **DISMISSED without prejudice**.[3]

*Count 4*

Chavez also alleges that he was denied a low gallery permit and brace. He alleges that Dearmond denied his request for a low gallery permit and his brace was taken from him despite his requests to extend the permit.[4] Chavez states a viable claim under the ADA and/or RA, but the claim cannot proceed against the individual defendants, because individual employees of IDOC cannot be sued under the ADA and RA. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012). The proper defendant is the relevant state department or agency. *See* 42 U.S.C. § 12131(1)(b); *Jaros*, 684 F.3d at 670, n. 2 (individual capacity claims are not available; the proper defendant is the agency or its director (in his official capacity)). As such, Latoya Hughes, the current IDOC Director, will remain in the case, in her official capacity only, as the proper defendant for Chavez's ADA and/or RA claims.

---

[3] Because Chavez fails to state a claim against Dr. Brophy under Section 1983, to the extent that Chavez also alleges that Dr. Brophy's actions amounted to negligence under Illinois state law, the Court declines to exercise supplemental jurisdiction over the state law claim. 28 U.S.C. § 1367(c)(3). Thus, any potential claim against Dr. Brophy under Illinois law is **DISMISSED without prejudice**.

[4] Chavez also alleges that ADA Coordinators Lawrence and Kuhnert responded to his grievances, noting that some of his complained of issues did not require an ADA accommodation. But they merely responded to his grievances. There are no allegations to suggest that Chavez submitted requests specifically to the coordinators or that either coordinator actually denied a requested accommodation.

*Count 5*

As to Wexford, the company can only be liable for deliberate indifference if it had a policy or practice that caused the constitutional violation. *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (applying municipal liability to private corporations performing governmental functions); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Here, Chavez has alleged that Wexford had a policy of understaffing the healthcare unit which led to delays in his care. Thus, Chavez may proceed against Wexford as to this practice.

Chavez also alleges that Wexford had poor record keeping and a practice of delaying specialty care. He fails, however, to provide any allegations regarding Wexford's record keeping process, and he has not alleged that any practice of Wexford's, other than the understaffing, delayed specialty care. Chavez notes that he was seen by outside providers on several occasions and had surgery on his knee while incarcerated at Menard. Thus, Chavez may only proceed on the claim against Wexford as it pertains to its alleged practice of understaffing the healthcare unit.

## Motion for Emergency Relief

Chavez recently filed a motion for emergency relief, alleging that three correctional officers, who are not parties in this case, threatened him to stop filing grievances and pursuing this case (Doc. 29). On July 29, 2026, the officers allegedly removed him from his cell and were walking with him when his knee gave out and he landed on the ground (*Id*. at p. 2). The officers then used excessive force on him, slamming his face into the bars, dragging him to the showers, and then beating him (*Id*.). They then

14

directed him to stop his grievances and lawsuit (*Id.*). He alleges that his knee injury is now worse than when he original filed his lawsuit, but he has been unable to obtain medical care (*Id.* at p. 4).

To the extent that Chavez alleges that he is now being retaliated against by non-parties for filing grievances and this lawsuit, these are new claims against individuals who are not parties in this lawsuit. Chavez would need to file a new lawsuit and seek injunctive relief in that case as it relates to his protection from these individuals. But to the extent that Chavez alleges that his knee is still injured and he is continuing to be denied medical care after reinjuring it, the Court **ADDS** the current Warden of Menard, Matthew Plummer, to the case to implement any injunctive relief that may be awarded. The Court **DEFERS** ruling on the motion, and Plummer is **DIRECTED** to respond to Chavez's motion within **14 days** of service. Plummer should indicate Chavez's current condition and the medical care he has received since July 29, 2026. Chavez's motion for status (Doc. 28) requesting the status of his pleading and request for injunctive relief is **MOOT**.

### Disposition

For the reasons stated above, Count 1 shall proceed against Nurse Practitioner Moldenhauer, Nurse Practitioner Crane, and Nurse Practitioner Dearmond. Count 2 shall proceed against Jane Doe #'s 1-5. Count 4 shall proceed against Latoya Hughes (official capacity only). Count 5 shall proceed against Wexford Health Sources, Inc. Count 6 shall proceed against Nurse Practitioner Moldenhauer, Nurse Practitioner Crane, and Nurse Practitioner Dearmond. Warden Matthew Plummer is **ADDED** in his official capacity for

15

purposes of identifying the unknown nurses and implementing any injunctive relief that may be awarded in this case. All other claims and defendants are **DISMISSED without prejudice**.

The Clerk of Court shall prepare for Nurse Practitioner Moldenhauer, Nurse Practitioner Crane, Nurse Practitioner Dearmond, Latoya Hughes (official capacity), Wexford Health Sources, Inc., and Matthew Plummer (official capacity only): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons) and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the First Amended Complaint, and this Memorandum and Order to each defendant's place of employment as identified by Chavez. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Chavez, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Amended Complaint and shall not waive filing a reply pursuant to 42 U.S.C.

16

§ 1997e(g). **Pursuant to Local Rule 8.2, Defendants need only respond to the issues stated in this Merit Review Order**.

Because Chavez's claims involve his medical care, the Clerk of Court is **DIRECTED** to enter the Court's standard HIPAA Qualified Protective Order.

If judgment is rendered against Chavez, and the judgment includes the payment of costs under Section 1915, he will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Chavez is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

DATED:  August 12, 2026

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**

17

## Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your Amended Complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to your Amended Complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answer, but it is entirely possible that it will take **90 days** or more. When all the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. **Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.**